UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor,<br><br>        Plaintiff,<br><br>    v.<br><br>SAYED ABBAS, et al.,<br><br>        Defendants. | Case No.  5:13-cv-04208-EJD<br><br>**CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER** |

Plaintiff Thomas E. Perez, the United States Secretary of Labor (the "Secretary"), brings the instant action against Defendants Stanford Yellow Taxi Cab, Inc. ("Stanford Yellow Cab"), Stanford Madeline Cab ("Madeline Cab"), Inc., AAA Legacy Limousine, Inc. ("AAA Limo"), and Sayed Abbas (collectively, "Defendants") for violations of Sections 11(a) and 15(a)(3) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 211(a) and 215(a)(3).  The Secretary seeks an order permanently enjoining Defendants and their associates from prospectively violating these FLSA provisions.

After the Secretary moved for a preliminary injunction (see Docket Item No. 9), the court determined the Secretary's entitlement to injunctive relief could not be determined without the presentation of live testimony.   Accordingly, the court consolidated the trial of this action with the injunction hearing pursuant to Federal Rule of Civil Procedure 65(a)(2), and heard the matter over three days.

Federal jurisdiction arises pursuant to 29 U.S.C. § 217 and 28 U.S.C. § 1345.  Having carefully considered the trial evidence and the arguments of counsel, the court, pursuant to Federal

United States District Court
Northern District of California

Rule of Civil Procedure 52(a), finds that the Secretary has met his burden to show that Abbas and his associates affiliated with Stanford Yellow Cab and AAA Limo did obstruct the Secretary's investigation in a manner that violates Section 11(a) of FLSA, and did retaliate against taxi and limousine drivers in violation of Section 15(a)(3) of FLSA.  Accordingly, an injunction in favor the Secretary will issue.

## I.     CREDIBILITY DETERMINATIONS AFTER COURT TRIAL

### A.     The Secretary's Case

The corporate defendants provide passenger transportation services in and around the San Francisco Bay Area.  Abbas is the owner and president of the corporate defendants.  The Secretary alleges that Defendants have misclassified workers operating as taxi and limousine drivers by designating them as independent contractors instead of employees.  The Secretary further alleges that Defendants have willfully obstructed the Secretary's investigation into that issue, and have retaliated against workers who protested Defendants' business practices or who participated in or demonstrated a willingness to participate in the Secretary's investigation.

The Secretary presented the testimony of seven witnesses - six drivers and one investigator employed by the Department of Labor.  Having observed and considered the testimony presented, the court concludes that the Secretary's witnesses provided credible testimony, as summarized below:

1.     Jose Delgado, a former driver for Stanford Yellow Cab, testified that Abbas scheduled him to work six days per week for twelve hours each day. See Tr. at 44:14-23.  He could not choose his own schedule and stated any change to his schedule had to be approved by Abbas, who made such changes difficult.  Id. at 45:3-46:2.  He was subject to several written rules as a driver, including a dress code, GPS monitoring, attendance expectations, call dispatch requirements, and conduct protocols.  Id. at 47:2-57:17.  He also entered into a lease agreement. Id. at 59:6-17.  He was aware of the Secretary's investigation into Defendants business practices, but was discouraged from cooperating and told by other drivers not to be "scared" because he was

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

an independent contractor.  Id. at 63:15-18; 65:19-21; 68:17-70:1.

2.     Anthony Freslassie, a former driver for Stanford Yellow Cab, was also scheduled by Abbas to work six days per week for twelve hours shifts.  Id. at 114:5-13.  Abbas would not permit him to change his schedule.  Id. at 114:16-115:2.  He was once fired for violating the dress code, but was rehired.  Id. at 115:4-25.  He was fired a second time for leaving his shift early after working for ten hours without earning any money.  Id. at 119:9-121:7.

3.     Tamba Kalfala, a former driver for Stanford Yellow Cab, was fired after he did not show up for a day of work.  Id. at 142:2-19.  Before that, he told Abbas that he was not earning money on Mondays, and asked for that day off or to switch his scheduled Mondays for another day of the week.  Id. at 142:14-143:8.  He split all fares with Stanford Yellow Cab equally, and could not negotiate that amount.  Id. at 145:16-22.  Kalfala stated that he could not turn down fares offered by dispatch and could not contact passengers directly.  Id. at 144:9-17; 148:1-21.

4.     Naod Haimanot, a former driver for Stanford Yellow Cab, testified that he could not turn down fares offered by dispatch and suffered a monetary penalty for doing so.  Id. at 172:17-173:12.  Abbas told him to meet with the company's lawyer to sign a declaration, but Haimanot did not agree with the statement and did not sign it.  Id. at 173:16-176:2.

5.     Miguel Chavez, a former driver for Stanford Yellow Cab and AAA Limo, stated that he could not turn down fares offered by dispatch.  Id. at 195:13-196:4.  He was told to report to dispatch before using the bathroom while waiting for a customer.  Id. at 197:24-198:6.  He attended an "unusual" drivers' meeting at the company office at which two other "favored" drivers, Joseph and Mostafa, told him that he was an independent contractor.  Id. at 198:7-199:22.  Although he was already working as a driver, he was presented with a lease agreement after the meeting.  Id. at 199:25-201:11.  Chavez was told that if he was approached by the Department of Labor, he should refer them to the company's attorney.  Id. at 203:11-204:9.

6.     Anthony Pelayo, a former driver for Stanford Yellow Cab, was terminated in February, 2014, by Abbas.  Id. at 259:17-21.  Abbas told Pelayo he could not "put up with [him]

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

1    anymore." Id. at 259:25-260:2.  He was given a letter outlining several reasons for his

2    termination, all of which he claimed were pretext since he believed he was fired for being named

3    as a witness by the Department of Labor.  Id. at 260:13-261:9; 263:25-264:8.  Pelayo stated,

4    however, that some of reasons for termination were not completely untrue because he had been

5    counseled for using foul language and had operated a vehicle that was overheating.  Id. at 262:1-

6    263:24.  Abbas and another driver, Joseph, told him not to speak with any investigators, and to say

7    he was an independent contractor if he did.  Id. at 264:9-265:15.  He was subject to written rules

8    while working at Stanford Yellow Cab and was not authorized to take days off or change his

9    schedule without Abbas' permission.  Id. at 267:16-277:13; 278:7-11.

10          7.       Martin Otero, an investigator for the Department of Labor, served four subpoenas

11   for the production of Defendant's records.  Id. at 354:7-19.  The Secretary obtained a court order

12   requiring Defendants to produce documents after their response to the subpoenas was deemed

13   insufficient.  Id. at 356:19-21.

14          **B.      The Defendants' Response**

15          Defendants called seven witnesses.  Having observed and considered the testimony

16   presented, the court concludes as follows:

17          1.       Michael Schofield, a former driver for AAA Limo, worked for Abbas from 2008 to

18   2013.  Id. at 382:22-383:3.  He testified that his contractual arrangement with AAA Limo gave

19   him the "ability to rent a car to use for picking up customers whereby [he] was paying the

20   company a percentage of [his] receipts for the use of the vehicle."  Id. at 384:11-17.  Schofield

21   also agreed with the statement that he had "total control" over the use of the vehicle and that his

22   time was his own.  Id. at 396:7-15.  He stated that he had the ability to grow his business by

23   leaving a professional impression on customers, and was aware that the upscale hotels he serviced

24   had a dress code for drivers on their property.  Id. at 397:12-398:2; 403:2-9.  He had his own

25   business cards with the telephone number for AAA Limo, not his personal telephone number.  Id.

26   at 398:6-15.  Abbas did not tell Schofield that he should not speak with the Department of Labor.

27

28
     4
     CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
     CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

1    Id. at 405:6-9.

2        Schofield's testimony reveals that his experience working for AAA Limo was more

3    positive than that of other drivers.  The details of his relationship with AAA Limo and Abbas are

4    consistent with those described by other drivers who testified during the Secretary's case.  The

5    court finds Schofield's consistent testimony credible.  However, Schofield's testimony overall is

6    not particularly compelling.   Although he described having significant freedom as a driver, he

7    was not asked about whether Defendants subjected him to rules, whether he broke any of those

8    rules, or whether he experienced consequences as a result.  If anything, Schofield's testimony only

9    demonstrates that some drivers feel less impacted by Defendants' restrictive practices; it does not

10   prove that those practices are non-existent.

11       2.      El Mostafa Khayati, a former driver for AAA Limo, believed he was an

12   independent contractor and not an employee.  Id. at 414:21-415:4.  He testified that he wanted to

13   be an independent contractor because he wanted the freedom to work or not work.  Id. at 416:22-

14   417:1.  Khayati believed he could decline calls offered by dispatch, could set his own hours, and

15   was not subject to any rules at work.  Id. at 418:14-419:7.  He stated that Abbas never told him not

16   to speak with the Department of Labor investigator, and stated that that he called the drivers'

17   meeting to discuss customer service, not to discuss the Department of Labor's investigation.  Id. at

18   426:4-7; 428:20-431:3.  Khayati testified that he is friends with Abbas and considers him a father

19   figure.  Id. at 434:4-7.

20       Khayati described a positive experience working as a driver for AAA Limo.  However,

21   unlike that of Schofield, Khayati's testimony was inconsistent to that of other drivers, particularly

22   on the subjects of rules, work schedule, and the level of freedom afforded to drivers.  Moreover,

23   Khayati's suggestion that he called the drivers' meeting solely to discuss customer service was not

24   believable.  He also revealed a strong bias in favor of Abbas and, according to the testimony of

25   other witnesses, was one of Abbas' preferred drivers.  For these reasons, the court finds that

26   Khayati's testimony lacks credibility.

27

28   Case No.: 5:13-cv-04208-EJD
     CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
     CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

1    3.    Lawrence Woldridge, an occasional driver for Stanford Yellow Cab, testified that

2   he is permitted to choose when he works and set his own hours.  Id. at 438:14-439:4.  He also

3   stated he could turn down fares offered by dispatch.  Id. at 440:17-19.  He was not told about a

4   dress code, but dresses well by choice.  Id. at 443:3-11.  Woldridge further stated he was not

5   dissuaded from speaking with the Department of Labor.  Id. At 443:24-444:2.

6        Although he has worked as a driver for seven years, Woldridge's status as an occasional

7   driver limited his knowledge of Defendants' business practices and differentiated him from the

8   full-time drivers.  Thus, while Woldrige's testimony was credible, the court attributes limited

9   weight to his observations.

10    4.    Joseph Rodriguez, a driver for AAA Limo, stated that can turn down calls offered

11   by dispatch, can set his own schedule, and can make his own reservations.  Id. at 452:23-453:4;

12   456:15-23; 466:2-21.  He testified that he called the drivers' meeting to discuss customer service.

13   Id. at 454:21-456:11.  He was never told by Abbas not to speak with the Department of Labor.  Id.

14   at 458:20-24.

15       Like Khayati, Rodriguez described a level of freedom inconsistent with that described by

16   other drivers.  In addition, he echoed Khayati's unbelievable statement that the purpose of the

17   drivers' meeting was to discuss customer service.  For these reasons, and because Rodriguez is

18   another of Abbas' favored drivers, the court finds that Rodriguez's testimony lacks credibility.

19    5.    Abubakar Janneh, a driver for Stanford Yellow Cab, testified that he signed an

20   agreement which permits him to choose his own work schedule, but also obligates him to take

21   fares from the Four Seasons and Rosewood hotels.  Id. at 473:21-474:4; 477:16-24.  He stated that

22   those hotels have a particular dress code for drivers.  Id. at 479:17-19.  He stated that he can turn

23   down calls offered by dispatch, can have customers call him directly, and can pick up customers

24   off the street.  Id. at 474:19-23; 476:4-9; 477:11-15.  He has a very positive opinion of Abbas,

25   whom he considers a father figure.  Id. at 489:15-22.  Janneh attended the drivers' meeting called

26   by Joseph, and stated that the subject discussed at the meeting was customer service.  Id. at

27

28
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

6

492:10-493:25.

Janneh's testimony was inconsistent not only with that of other drivers, but also with a prior statement he signed.  He also revealed a strong bias in favor of Abbas.  Thus, the court finds that his testimony lacks credibility.

6.      Shahzeb Khan, a driver for AAA Limo, testified that he has a fee-splitting agreement but has his own clients, can turn down fares offered by dispatch, and has "total control" over his use of the vehicle.  Id. at 522:10-523:8; 533:2-11.  He stated that the Four Seasons and Rosewood hotels have a dress code for drivers on their properties.  Id. at 528:23-529:9.  Khan was never told not to speak to the Department of Labor.  Id. at 529:23-530:4.  He thinks Abbas is a "great man" and "cooks the best food."  Id. at 530:5-531:2.

For reasons similar to the statements made by Janneh, the court finds that Khan's testimony lacks credibility.  It is inconsistent with that of other drivers and Khan revealed a bias in favor of Abbas.

7.      Sayed Abbas testified that he never told drivers not to cooperate with the Department of Labor and was not aware of the drivers' meeting described by other witnesses.  Id. at 535:4-18.  He believes the drivers are independent contractors, does not keep employment records, and does not deduct employment taxes from the drivers' payouts.  Id. at 552:15-556:1.

Abbas' description of the agreements with drivers is consistent with that of the Secretary's witnesses, and the court finds that portion of Abbas' testimony credible.  However, the court finds Abbas' other testimony unbelievable, including the statements that he did not discourage drivers from cooperating with the Department of Labor and was unaware of the drivers' meeting.  other credible witnesses stated that while the meeting was taking place, Abbas was sitting in an office that faced the location of the meeting and could view the meeting from that location.

## II.      FINDINGS OF FACT

1.      It is undisputed that Stanford Yellow Cab, AAA Limo and Stanford Madeline Cab, Inc. are each California corporations licensed to do business in the state.  The principal place of

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

1     business for each company is located at 935 Sierra Vista Avenue, Mountain View, California

2     94043.  See Docket Item No. 60, at 4:8-19.

3          2.     It is undisputed that Abbas is and has been the owner and president of Stanford

4     Yellow Cab, AAA Limo, and Madeline Cab.  Id. at 4:20-21.

5          3.     It is admitted by Defendants that Stanford Yellow Cab, AAA Limo, Madeline Cab

6     and another entity, FirstChoice Limousine & Town Car Service, Inc., had a combined annual

7     gross volume of sales made or business done of more than $500,000, in 2011, 2012, and 2013.

8     See Docket Item No. 58.

9          4.     It is undisputed that Abbas is the only supervisor, officer or executive at Stanford

10    Yellow Cab and AAA Limo.  See Docket Item No. 60, at 4:22-24.

11         5.     It is undisputed that Stanford Yellow Cab and AAA Limo own a fleet of taxi cabs

12    and town cars which are stored at 935 Sierra Vista Avenue, Mountain View, California 94043.  Id.

13    at 5:1-4.

14         6.     It is undisputed that Stanford Yellow Cab and AAA Limo employ and have

15    employed dispatchers to receive calls, dispatch drivers, process credit card payments, and

16    coordinate Defendants' equipment.  Id. at 5:5-7.

17         7.     It is undisputed that Dispatchers paid by Stanford Yellow Cab receive calls and

18    dispatch town cars owned by Defendant AAA Limo, and that dispatchers paid by AAA Limo

19    receive calls and dispatch taxi cabs owned by Stanford Yellow Cab.  Id. at 5:8-11.

20         8.     It is undisputed that Abbas supervises dispatchers paid by Stanford Yellow Cab and

21    AAA Limo.  Id. at 5:12-13.

22         9.     It is undisputed that if an individual calls requesting a town car from AAA Limo

23    but none are available, Defendants' practice is to offer the caller a taxi cab from Stanford Yellow

24    Cab.  Id. at 5:14-15.

25         10.    It is undisputed that Abbas has and continues to perform the duties of a dispatcher.

26    Id. at 5:16.

27

28    Case No.: 5:13-cv-04208-EJD
      CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
      CONCLUSIONS OF LAW; ORDER

8

United States District Court
Northern District of California

11.      Abbas has authority to hire and fire drivers for Stanford Yellow Cab and AAA Limo.

12.      Other than the legal ability to drive, no other specialized skills are required to drive Defendants' taxi cabs or town cars.

13.      When drivers start working for Defendants, drivers are told they are expected to work twelve hours per day, six days per week, from either 7:00 a.m. to 7:00 p.m. or from 7:00 p.m. to 7:00 a.m.

14.      It is undisputed that most of Defendants' drivers actually operated or continue to operate Defendants' vehicles six days per week. Id. at 7:3-4.

15.      It is undisputed that Defendants' drivers typically operated or continue to operate Defendants' vehicles for a period of twelve hours per day. Id. at 7:5-6.

16.      Abbas requires drivers to work their entire scheduled shift, and drivers are required to obtain approval from Abbas to end their shifts early.

17.      Drivers are not permitted to otherwise alter their set work schedule or take days off of work without Abbas' permission.

18.      Defendants provide drivers with a document entitled "Conflict of Interest Policy," and require drivers to comply with the rules outlined in the document. See Ex. 42.

19.      The Conflict of Interest Policy precludes drivers from taking any action which "would lead a reasonable person to question whether [the driver's] motivations are aligned with [Defendants'] best interests," including "use of company information for private gain," and "working for another Company that does the same business after hours." Id.

20.      The Conflict of Interest Policy also states that all customer information is the property of Defendants and cannot leave Defendants' offices during or after a drivers' period of employment. Id.

21.      Defendants provide drivers a document entitled "Policy & Procedures," and require drivers to comply with the rules outlined in the document. See Ex. 45.

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

22.     Defendants' "Policy & Procedures" require drivers to adhere to a dress code during operation of Defendants' vehicles. Id.

23.     The dress code states: "1. All Town Car and Taxi Cab Drivers must be showered, apply underarm deodorant and be well groomed.  2. All drivers must wear well-ironed and crispy clean clothes.  3. All drivers must wear company uniform which comprises of, black pants, white shirts, and black shoes.  Town Car drivers must also wear a tie and a sports blazer jacket.  4. Shorts, T-shirts, slippers and dingy discolored shirts are not permitted." Id.

24.     Defendants' "Policy & Procedures" document states: "All flag pick-ups have to be reported to the dispatcher immediately . . . . Unreported Flag pick-up is considered stealing from the company and could lead to cancellation of lease." Id.

25.     Defendants actually do require drivers to report any "flag pick-ups" to dispatch immediately.

26.     The "Policy & Procedures" document also states: "Drivers are not permitted to exchange phone numbers with customers.  Only the company business cards may be distributed. They are not permitted to solicit any other business or be in possession of any personal information of the customer.  The company randomly follows up with the customers and any driver who is found in violation of this policy will be released and could be prosecuted to the full extent of the law." Id.

27.     Defendants do actually prohibit drivers from obtaining customer contact information and from providing to customers the driver's personal contact information.

28.     Defendants provide drivers a document entitled "Addendum to Policy & Procedures," and require drivers to comply with the additional rules outlined in the document. See Ex. 46.

29.     The addendum states: "All drivers must work their entire shift.  Regardless of how the business flow is, the drivers are expected to work their scheduled shift." Id.

30.     Defendants provide drivers a document entitled "Free Ride Policy," and require

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

1   drivers to comply with the additional statements outlined in the document.  See Ex. 44.

2        31.    The Free Ride Policy states: "[A]ny free ride given to a customer will be paid for

3   by the accountable party - Dispatcher or Driver."  Id.

4        32.    The Free Ride Policy implies that drivers will pay for any free rides that result from

5   "being late to client pick-up," "not writing accurate pick-up information directly on the way bill,"

6   not answering the "phone promptly when dispatcher calls," not calling the "office in the first five

7   minutes of not finding the pick-up address," and "incorrect estimation of customer pick-up time."

8   Id.

9        33.    Defendants provide drivers a document entitled "Drivers Responsibilities," and

10   require drivers to comply with the rules outlined in the document.  See Ex. 48.

11        34.    The "Drivers Responsibilities" document requires drivers to be on time for work,

12   and states that "[t]ardiness will lead to being fired or lower priority."  Id.

13        35.    The "Drivers Responsibilities" document states: "All drivers will dress

14   appropriately.  Town car drivers must wear Dress pants, shirt, shirt, shoes and a tie. (White shirt,

15   black pants, black tie and black shoes will be nice)."  Id.

16        36.    The "Drivers Responsibilities" document states: "Keep cars clean and fill gas

17   completely at end of every shift. (The driver responsible for less gas and or dirty car will be

18   charged for the cost of cleaning and filling gas to that car plus an extra $15.00)."  Id.

19        37.    The "Drivers Responsibilities" document states: "You cannot use flat rates with

20   coupons."  Id.

21        38.    The "Drivers Responsibilities" document states: "You must step out of the vehicle

22   to open the door and put luggage in the car."  Id.

23        39.    It is undisputed that Defendants have a billing account with Google, such that

24   Defendants bill Google instead of the affiliated individual being transported in Defendants'

25   vehicles.  See Docket Item No. 60, at 5:19-20.

26        40.    It is undisputed that Defendants have an agreement with the Four Seasons Hotel in

27

28   Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

1   East Palo Alto, California.  Per the agreement, the Four Seasons Hotel permits five Stanford

2   Yellow Cab drivers to park and wait in line at the hotel.  Id. at 5:18-23.

3          41.     It is undisputed that the Four Seasons Hotel has expressed displeasure when

4   Defendants do not have a driver waiting on the premises to transport hotel customers.  Id. at 5:24.

5          42.     Defendants have an agreement with the Rosewood Hotel in Menlo Park, California.

6          43.     Defendants require drivers to wait for fares at the Four Seasons and Rosewood

7   hotels.

8          44.     Defendants have an agreement with Stanford University.

9          45.     It is undisputed that "Flywheel," formerly known as "Cabulous," is a Global

10  Positioning System ("GPS) device.  Defendants purchased such devices and have used the devices

11  to ascertain the location of Defendants' vehicles and the drivers operating those vehicles.  See

12  Docket Item No. 60, at 6:1-3.

13         46.     Defendants receive the vast majority of fares from either Defendants' dispatchers,

14  or from the Four Seasons and Rosewood hotels.

15         47.     Defendants require drivers to answer any calls from dispatchers.

16         48.     Drivers are not permitted to turn down fares offered by Defendants' dispatchers

17  without suffering a penalty.

18         49.     It is undisputed that Defendants do not assign a particular vehicle to each driver,

19  and that drivers pick up their keys for the day at the beginning of each shift.  It is possible for a

20  driver to operate a different vehicle each day.  Id. at 6:4-8.

21         50.     It is undisputed that drivers must return Defendants' vehicles at the end of each

22  driving period, and Defendants do not permit drivers to take the vehicles home without specific

23  authorization.  Id.

24         51.     It is undisputed that taxi cabs owned by Stanford Yellow Cab say "Stanford Yellow

25  Cab."  Id. at 5:17.

26         52.     Defendants require drivers to sign a document entitled "Lease Agreement," which

27

28
Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

purports to set out the details of a vehicle rental contract between the driver, or lessee, and

Defendants, or lessors.  See Exs. 37-39.

53.     The "Lease Agreement" states, in pertinent part:

a.     "LESSEE acknowledges that the selection of work hours and days are strictly a matter of LESSEE'S own choice."

b.     "It is expressly understood between the parties that once the LESSEE takes possession of the taxicab, he/she will exercise complete discretion in the operation of the same . . . ."

c.     "LESSEE is not required to account for the amount of fares he/she has collected from taxicab passengers, nor is he/she required to share his/her fares with the LESSOR . . . ."

d.     "LESSEE shall not be restricted by LESSOR in any manner as to the area in which he/she may operate said rented municipally licensed taxicab nor shall he/she be required to remain at any specified place (unless mutually agreed on) or arbitrarily assigned to any on duty fixed hours, nor shall he/she be restricted from servicing orders for service from sources other than LESSOR . . . ."

e.     "LESSEE shall not be required to report the location or whereabouts of said taxicab at any time during the rental period . . . ."

f.     "LESSEE is not restricted by any manner from developing his/her own personal business by and including soliciting accounts, advertising, providing communications equipment, and providing service to increase revenue."

g.     LESSEE is not required by this lease to dress in any manner nor wear any uniform, nor will LESSOR enforce any municipally required dress code. Id.

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

54.     The statements from the Lease Agreement detailed in the aforementioned paragraph do not, in fact, reflect Defendants' actual business practices.

55.     It is undisputed that Defendants pay for any repairs to vehicles in their fleets.  <u>See</u> Docket Item No. 60, at 5:18.

56.     It is undisputed that drivers do not pay any fees to Defendants to lease Defendants' vehicles.  <u>Id</u>. at 6:9.

57.     It is undisputed that Stanford Yellow Cab receives sixty percent of each fare received by a driver operating one of Stanford Yellow Cab's vehicles.  Drivers retain all of the tips they receive.  <u>Id</u>. at 6:10-11.

58.     It is undisputed that prior to October, 2012, Stanford Yellow Cab received fifty percent of each fare and fifty percent of each tip received by a driver operating one of Stanford Yellow Cab's vehicles.  <u>Id</u>. at 6:12-13.

59.     It is undisputed that AAA Limo takes seventy percent of each fare received by a driver operating one of AAA Limo's vehicles.  Drivers retain all of the tips they receive.  <u>Id</u>. at 6:14-15.

60.     It is undisputed that prior to October, 2012, AAA Limo received fifty percent of each fare and fifty percent of each tip received by a driver operating one of AAA Limo's vehicles.  <u>Id</u>. at 6:16-17.

61.     It is undisputed that when a driver is finished operating Defendants' vehicles for the day, Defendants require the driver to complete a log showing their hours, where they drove, and the fares they received.  Drivers must provide to Defendants a written log along with the receipts for any fares paid via credit card.  <u>Id</u>. at 6:18-21.

62.     It is undisputed that each Wednesday, Defendants remit to drivers their portion of the credit card fares they earned the prior week, after any amounts the driver owes Defendants are deducted.  <u>Id</u>. at 6:22-23.

63.     It is undisputed that, for companies with an account or agreement with Defendants,

United States District Court
Northern District of California

Defendants charge a flat rate for trips to the airport.  Drivers have no input on the rate to be charged for these trips.  Id. at 6:24.

64.     It is undisputed that Defendants charge an hourly rate to customers wishing to charter a vehicle and driver for multiple hours.  Drivers have no input on the rate to be charged for these charter trips.  Id. at 7:1-2.

65.     The Secretary, through the Department of Labor's Wage and Hour Division, opened an investigation of Defendants in September, 2012.

66.     Otero was assigned to the investigation of Defendant in mid-October, 2012.

67.     Since September, 2012, the Secretary has attempted to interview drivers working for Stanford Yellow Cab and AAA Limo to determine whether Defendants were complying with FLSA.

68.     Abbas and his associates, including Khayati and Rodriguez, have instructed drivers not to provide information to the Department of Labor.

69.     Abbas and his associates, including Khayati and Rodriguez, have instructed drivers to tell the Department of Labor that the drivers are independent contractors.

70.     Eric Hartman was Defendants' attorney.

71.     Abbas and his associates have instructed drivers to give Hartman's business card to anyone who approaches them from the Department of Labor.

72.     Drivers have not fully cooperated with the Department of Labor's investigation of Defendants.

73.     Before September, 2012, Defendants did not require all drivers to sign lease agreements when the drivers started driving for Defendants.

74.     Defendants had some drivers sign lease agreements after learning of the Secretary's investigation, and had them provide a false date on those agreements such that they appear to have been executed prior to initiation of the Secretary's investigation.

75.     On October 24, 2012, the Secretary caused to be issued four subpoenas to: (1)

15

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

"Sayed Hassan Abbas doing business as AAA Yellow Cab, All Bay Taxi Cab, All Bay Yellow Cab, Los Altos Yellow Cab, Stanford Yellow Cab, Stanford Yellow Cab Palo Alto, Yellow AAA Cab, Yellow Cab, Yellow Cab Allbay, Yellow Cab of Stansford [sic], Yellow Cab Santa Clara;" (2) AAA Legacy Limousine, Inc.; (3) Stanford Yellow Cab, Inc.; and (4) First Choice Logistics, Inc.  See Ex. 9.

76.     Defendants produced documents in response to the subpoenas.

77.     On August 20, 2013, United States District Judge Susan Illston issued an order entitled "Order re Secretary's Petition to Enforce Administrative Subpoenas."  See Ex. 58.

78.     Judge Illston's order states, in pertinent part, that Abbas, "dba as AAA Yellow Cab, All Bay Taxi Cab, All Bay Yellow Cab, Los Altos Yellow Cab, Los Altos Yellow Cab, Stanford Yellow Cab, Stanford Yellow Cab Palo Alto, Yellow AAA Cab, Yellow Cab, Yellow Cab Allbay, Yellow Cab of Stanford and Yellow Cab Santa Clara; AAA Legacy Limousine, Inc.; Stanford Yellow Cab, Inc.; and First Choice Logistics, Inc." shall produce "all documents responsive to the subpoenas in its possession, custody or control on or before Aug. 30, 2013."  Id.

79.     Defendants produced documents in response to Judge Illston's order.

80.     The Secretary did not seek further enforcement of Judge Illston's order.

81.     Kalfala stopped driving for Defendants in or around August, 2012.

82.     Abbas terminated Kalfala when he failed to appear for work after complaining about working for no wages.

83.     Abbas terminated Freslassie when he left his shift early after complaining about working for no wages.

## III.     CONCLUSIONS OF LAW

1.     The business activities of Stanford Yellow Cab, AAA Limo and Madeline Cab constitute an "enterprise" as that term is defined in Section 3(r) of FLSA, 29 U.S.C. § 203(r).

2.     Defendants are a single "enterprise engaged in commerce or in the production of goods for commerce," as that term is defined in Section 3(s) of FLSA, 29 U.S.C. § 203(s).

United States District Court
Northern District of California

3.      Defendants, including Abbas, were and are "employers" within the meaning of Section 3(d) of FLSA, 29 U.S.C. § 203(d).

4.      Workers who drive Defendants' vehicles are employees within the meaning of Section 3(e)(1) of FLSA, 29 U.S.C. § 203(e)(1).

      a.      An "employee" is "any individual employed by an employer."  29 U.S.C. § 203(e)(1).

      b.      Courts apply an expansive interpretation of the term "employee" under FLSA.  Real v. Driscoll Strawberry Assocs., Inc., 603 F.2d 748, 754 (9th Cir. 1979).  "The common law concepts of 'employee' and 'independent contractor' are not conclusive determinants of the FLSA's coverage."  Id.

      c.      The following factors are considered to distinguish employees from independent contractors under FLSA: (1) "the degree of the alleged employer's right to control the manner in which the work is to be performed;" (2) "the alleged employee's opportunity for profit or loss depending upon his managerial skill;" (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;" (4) "whether the service requires a special skill;" (5) the degree of permanence of the working relationship;" and (6) whether the service rendered is an integral part of the alleged employer's business."  Id.

5.      Defendants have violated and will continue to violate Section 11(a) of FLSA, 29 U.S.C. § 211(a), by interfering with the Secretary's investigation into Defendants' compliance with FLSA.

6.      Defendants' violations of the investigating provisions of Section 11(a) were willful in nature.

7.      Defendants have violated and will continue to violate Section 15(a)(3) of FLSA, 29

17

United States District Court
Northern District of California

1    U.S.C. § 215(a)(3), by discharging employees who complained about working long hours for little

2    or no pay, or who otherwise sought to exercise their right under FLSA to be paid at least a

3    minimum wage for every hour worked.

4           8.     Defendants' violations of Section 15(a)(3) were willful in nature.

5           9.     Section 17 of FLSA, 29 U.S.C. § 217 provides district courts with "jurisdiction, for

6    cause shown, to restrain violations of section 15 [of FLSA]."

7         10.    "Before a court may issue a permanent injunction, a party must show (1) that it has

8    suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

9    inadequate to compensate for that injury; (3) that, considering the balance of hardships between

10   the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would

11   not be disserved by a permanent injunction." W. Watersheds Project v. Abbey, 719 F.3d 1035,

12   1054 (9th Cir. 2013) (internal quotations omitted).

13        11.    Defendants' violations of Section 15(a)(3) have caused and continue to cause

14   irreparable injury to the Secretary, to Defendants' drivers, and to the public at large.

15        12.    The remedies available at law are inadequate to address Defendants' violations of

16   Sections 11(a) and 15(a)(3).

17        13.    The balance of hardships weight strongly in favor of the Secretary, such that an

18   injunctive remedy to restrain Defendants' violations is warranted.

19        14.    The public interest is served by a permanent injunction enjoining Defendants from

20   committing further violations Sections 11(a) and 15(a)(3).

21        15.    The Secretary is entitled to a prospective injunction pursuant to Section 17 of

22   FLSA and this court's inherent equitable authority permanently enjoining and restraining

23   Defendants, their officers, agents, servants, employees, and all persons acting in their behalf and

24   interest from violating Sections 11(a) and 15(a)(3), including, but not limited to, by instructing any

25   individual not to speak to representatives of the Secretary; obstructing the Secretary's

26   investigation in any way; or retaliating or threatening to retaliate against any driver or any

27

28
     CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
     CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

employee for reporting or complaining about any violations of FLSA.

16.     The Secretary is entitled to a prospective injunction pursuant to Section 17 of FLSA and this court's inherent equitable authority tolling the running of the statute of limitations for asserting any claim against Defendants under the FLSA as of September 20, 2012.

17.     The Secretary is entitled to a prospective injunction pursuant to Section 17 of FLSA and this court's inherent equitable authority requiring Abbas, within three days of the date this order is filed, to post, in a prominent location at the central office of Stanford Yellow Cab and AAA Limo in a manner viewable to all drivers, a complete copy of this Order, and, within ten days of the date this order is filed, to distribute individual copies of this Order to every current driver for Defendants and obtain a written acknowledgement of receipt from each driver.  Abbas shall provide copies of all acknowledgements of receipt to the Secretary within twenty days of the date this Order is filed.

18.     The Secretary is entitled to a prospective injunction pursuant to Section 17 of FLSA and this court's inherent equitable authority which prohibits Defendants from destroying any record in their possession, custody or control showing the hours worked by drivers, and/or the amounts paid to drivers.

19.     The Secretary is entitled to a prospective injunction pursuant to Section 17 of FLSA and this court's inherent equitable authority which requires Defendants, within three days of the date this Order is filed, to provide access to all records of hours worked by drivers, amounts paid to drivers, and tax statements applicable to drivers.

20.     The Secretary is entitled to a prospective injunction pursuant to Section 17 of FLSA and this court's inherent equitable authority requiring Defendants to maintain the time and payroll records required under 29 U.S.C. § 211(c) and implementing regulations found at 29 C.F.R. Part 516 for all employees.

**IV.     ORDER**

Based on the foregoing, the court orders as follows:

19

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

1.      Effective immediately, Defendants, their officers, agents, servants, employees, and all persons acting in their behalf and interest shall not violate Sections 11(a) and 15(a)(3) of FLSA, including, but not limited to, instructing any individual not to speak to representatives of the Secretary; obstructing the Secretary's investigation in any way; or retaliating or threatening to retaliate against any driver or any employee for reporting or complaining about any violations of FLSA.

2.      The statute of limitations for asserting any claim against Defendants under the FLSA as of September 20, 2012 is tolled.

3.      Abbas, within three days of the date this order is filed, shall post, in a prominent location at the central office of Stanford Yellow Cab and AAA Limo in a manner viewable to all drivers, a complete copy of this Order, and, within ten days of the date this order is filed, shall distribute individual copies of this Order to every current driver for Defendants and obtain a written acknowledgement of receipt from each driver.  Abbas shall provide copies of all acknowledgements of receipt to the Secretary within twenty days of the date this Order is filed.

4.      Effective immediately, Defendants shall not destroy any record in their possession, custody or control showing the hours worked by drivers, and/or the amounts paid to drivers.

5.      Defendants shall, within three days of the date this Order is filed, provide to the Secretary access to all records of hours worked by drivers, amounts paid to drivers, and tax statements applicable to drivers.

6.      Effective immediately, Defendants shall maintain the time and payroll records required under 29 U.S.C. § 211(c) and implementing regulations found at 29 C.F.R. Part 516 for all employees.

//

//

//

//

Case No.: 5:13-cv-04208-EJD
CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
CONCLUSIONS OF LAW; ORDER

United States District Court
Northern District of California

1    Judgment shall be entered in favor of the Secretary, and the Clerk shall close this file.

2

3    **IT IS SO ORDERED.**

4    Dated:  May 13, 2015

5    

6    EDWARD J. DAVILA
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          21

28   Case No.: 5:13-cv-04208-EJD
     CREDIBILITY DETERMINATIONS AFTER COURT TRIAL; FINDINGS OF FACT AND
     CONCLUSIONS OF LAW; ORDER